FILED _____ RECEIVED
_____ ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

MAY 2 8 2008

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

1  GREGORY A. BROWER
   United States Attorney
2  CHRISTINA M. BROWN
   Assistant United States Attorney
3  333 Las Vegas Blvd., S., Fifth Floor
   Las Vegas, Nevada 89101
4  (702) 388-6336

5               **UNITED STATES DISTRICT COURT**

6                    **DISTRICT OF NEVADA**

7                          **-oOo-**

8  UNITED STATES OF AMERICA,        )
                                     )   CRIMINAL INDICTMENT
9        PLAINTIFF,                  )
                                     )   2:08-CR- ___*161*___
10 VS.                              )
                                     )   **VIOLATIONS:**
11 CASEY LUCZAK,                    )
                                     )   18 U.S.C. § 1343 - Wire Fraud (26 Counts)
12 ____DEFENDANT._____ )
                                         18 U.S.C. § 1001 - False Statement ____
13

14 **THE GRAND JURY CHARGES THAT:**

15                      **INTRODUCTION**

16       At all time relevant to this indictment:

17       From in or about 2002 to in or about 2005, in the State and Federal District of

18 Nevada and elsewhere,

19                      **CASEY LUCZAK** ,

20 the defendant herein and others known and unknown to the grand jury, operated an

21 advanced fee scheme whereby Defendant targeted individuals and entities seeking business

22 loans ("victims") and, in exchange for a payment of fees, promised to loan or help them

23 obtain business loans, when Defendant then and there well knew that he would not loan or

24 help victims obtain loans and would instead keep the fees for his personal enrichment.

25 . . .

26 . . .

**Persons and Entities**

1. Defendant **CASEY LUCZAK** was a resident of Las Vegas, Nevada.

2. Defendant incorporated TIG Ventures, Inc. ("TIG" and "The Interchange Group") in the state of Nevada in 2002.

3. Defendant caused another individual to create an entity under the fictitious name Gemini Capital Fund ("Gemini" or "The Gemini Fund"), and represented and caused to be represented to victims that Gemini was wholly owned and managed by TIG.

**The Victims**

4. Advanced Rehabilitation Technologies (aka "Applied Resources") was a New Jersey company, principally managed by Matthew Collelo.

5. Agile Risk Management was a Georgia company, principally managed by Ross Stratham.

6. Beyond Appraisal was a Texas company, principally managed by Patrick Hannon.

7. Gary and Penny Cook resided and conducted business in Oklahoma.

8. Excalibur Golf Club was a Missouri company, principally managed by Robert Kuhlmann.

9. Infinity Technology Services was an Ontario, Canada, company, principally managed by Richard Charland.

10. Information Becomes Money was a Georgia company, principally managed by Bert Falls and Al Calloway.

11. Innotek was a Washington company, principally managed by Ryan Jensen.

12. Leavitt's Mortuary was a Utah company, principally managed by Michael Leavitt.

13. Macino Enterprises, Inc. was a New Jersey company, principally managed by James Mack.

14. OTC Fiberglass Products was a Kansas company, principally managed by Phillip Elsworth.

15. Organic Pastures Dairy Company LLC was a California company, principally managed by Mark McAfee.

16. Personal Touch Catering was a Maine company, principally managed by Kevin Fallen.

17. Senior Trends Network LLC (aka Tony Mistretta Graphics) was an Illinois company, principally managed by Ted Howard.

18. Triangle Transformation Inc. was a California company, principally managed by Robert Hill and Anthony Morales.

19. Universal Healthcare was a Florida company, principally managed by Kenneth Hankin.

20. 31S was a Michigan company, principally managed by John Cain.

### COUNTS ONE THROUGH TWENTY-SIX
#### Wire Fraud

1. Paragraphs one through twenty are re-alleged and incorporated herein as if set forth in full.

2. From in or about 2002 to in or about April 2005, in the State and Federal District of Nevada and elsewhere,

**CASEY LUCZAK**,

defendant herein, and others known and unknown to the grand jury, did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, as more fully set forth below.

.  .  .

.  .  .

.  .  .

3

## The Scheme and Artifice

### False representations regarding TIG and Gemini

3.     It was part of the scheme and artifice that Defendant falsely and fraudulently represented on TIG's internet website and in marketing materials provided to victims that TIG was a large-scale "international private investment fund" which assisted individuals to obtain start-up or expansion business loans, when Defendant then and there well knew that these representations were false and fraudulent.

4.     It was further part of the scheme and artifice that in order to lure and convince victims to pay up-front "processing fees" ("advanced fees)," Defendant falsely and fraudulently represented and caused others to represent to victims (by use of the internet, various marketing materials, and in written and verbal communications) that TIG was in the business of providing loans, providing legitimate collateral to be used as security for loans, and facilitating loans by bringing victims together legitimate lenders who were willing and capable of providing loans, the latter of which Defendant falsely stated that TIG accomplished by accessing a "network of international private investors" to which TIG was purportedly linked, when Defendant then and there well knew that such representations were false and fraudulent.

5.     It was further part of the scheme and artifice that Defendant falsely and fraudulently represented and caused others to represent to victims that TIG had been in business since 1974, that TIG and Gemini had "nearly 3 billion dollars" under their direct management and control, that TIG had invested financially in more than 180 companies, that TIG had a "board of directors with experience in more than 150 companies," and, that TIG had been awarded a certificate from the Better Business Bureau for "thirty complaint-free years," when Defendant then and there well knew that such representations were false and fraudulent.

.   .   .

4

6. It was further part of the scheme and artifice that Defendant offered victims one of two contracts which he represented as means to obtain loans. One was TIG's "Letter of Commitment," the other was its "Letter of Agreement." By the terms of these contracts, and in communications with victims, Defendant required and did receive fees from victims prior to providing services, when he then and there well knew that he did not intend to provide loans, legitimate collateral, or to otherwise facilitate loans as promised, and further knew that he made such false representations and promises to victims for the sole purpose of obtaining money for his personal enrichment.

7. It was further part of the scheme and artifice that for the purpose of providing victims a false sense of security and confidence in TIG and in order to persuade them to send Defendant money before receiving anything of value in exchange, Defendant falsely and fraudulently represented to victims that TIG and Gemini would refund advanced fees if TIG and Gemini failed to perform as promised, when Defendant then and there well knew that he did not intend to return victims' fees, but intended to, and did, use the fees for his personal enrichment.

**The Contracts**

*Letter of Commitment*

8. It was further part of the scheme and artifice that Defendant falsely and fraudulently represented to victims in TIG's "Letter of Commitment" that TIG would provide collateral to victims which they could use as security with lending institutions to obtain loans, and further represented that all or part of the fees victims paid would be used by TIG to reserve or purchase collateral and pay fees to loan "facilitators" or "due diligence" examiners, when Defendant then and there well knew that he did not intend to provide victims with collateral which would be acceptable at conventional lending institutions, nor did Defendant intend to use victims' fees to reserve or pay for collateral, facilitators, due diligence exams, or for any other purpose legitimately associated with helping victims obtain loans.

5

9. It was further part of the scheme and artifice that Defendant falsely and fraudulently promised victims that if they were unable to find a lender willing to accept the collateral, that TIG would place victims with alternate lenders (referenced in contracts as "viable funding solutions"), when Defendant then and there well knew that these "lenders" were neither legitimate nor "viable." It was further part of the scheme and artifice that when victims were unable to obtain loans from these individuals and entities, Defendant fraudulently refused to refund the fees victims had paid TIG, and falsely and fraudulently claimed that because TIG had provided the victims with "viable funding solutions," the victims were not entitled to a refund of their fee.

***Letter of Agreement***

10. It was further part of the scheme and artifice that Defendant falsely and fraudulently represented in TIG's "Letter of Agreement" that TIG would loan victims money through Gemini and other "internally-controlled funding portfolios," and through TIG's external "networking partners,"and that Defendant falsely and fraudulently portrayed and caused others to portray to victims that Gemini was a "fund that re-invests profits from initial investments made in stocks, bonds and securities. These funds are typically directed to start-ups and early stage development companies. Available funds in this portfolio exceed 100 million ...," when Defendant then and there well knew that Gemini had no such funding "assets," "available funds," "internal funding portfolios"or external "networking partners," nor had TIG or Gemini ever provided victims loans through any such mechanism.

11. It was further part of the scheme and artifice that when Gemini failed to distribute loans to victims as promised, Defendant falsely and fraudulently represented and caused others to represent to victims that the delays were due to events "beyond the control" of Defendant, TIG, and Gemini, and that TIG was unable to refund victims' fees because the fees had been used to pay for loan "facilitators," due diligence examiners, and for other purportedly-legitimate expenses, when Defendant then and there well knew that neither TIG,

1  Gemini, any entity under the control of either had funds with which to provide loans to
2  victims, and that victims' fees were "unavailable" to refund because Defendant had converted
3  them to his own use.

4  **Threats and Intimidation**

5      12.  It was further part of the scheme and artifice that when victims filed complaints
6  with the Better Business Bureau, threatened to report TIG and Gemini to authorities, and
7  threatened legal action, defendant attempted and caused others to attempt to intimidate,
8  manipulate, retaliate, and silence victims by various means, including making threats to place
9  victims' projects "on hold" if they filed or refused to remove complaints, by threatening legal
10  action, and by claiming that victims had failed to perform as the contract required, when
11  defendant then and there well knew that he, TIG, and Gemini had failed to perform as
12  promised under the contracts.

13                    **Execution of the Scheme and Artifice**

14      13.  On or about the dates set forth in the separate counts below, in the State and
15  Federal District of Nevada and elsewhere,

16                              **CASEY LUCZAK,**

17  defendant herein, for the purpose of executing the scheme and artifice, did transmit and
18  cause to be transmitted by means of wire communication in interstate commerce certain
19  writings, signs and signals, that is, facsimile correspondence to and from TIG, located in Las
20  Vegas, Nevada, and wire transfers of funds from outside the State and Federal District of
21  Nevada to TIG and Gemini bank accounts in the State and Federal District of Nevada, as
22  follows:

23  .  .  .

24  .  .  .

25  .  .  .

26  .  .  .

7

**Facsimile Correspondence**

| COUNT | DATES | ITEM SENT BY FACSIMILE |
|---|---|---|
| 1 | 7/21/2003 | fax to Matt Collelo, Advanced Rehabilitation |
| 2 | 4/29/2004 | fax to Ross Stratham, Agile Risk Management Group, LLC |
| 3 | 9/23/2003 | fax to Patrick Hannon, Beyond Appraisal |
| 4 | 1/21/2005 | fax to Gary and Penny Cook |
| 5 | 8/20/2005 | fax to Gary and Penny Cook |
| 6 | 10/28/2004 | fax to Robert Kuhlmann, Excaliber Golf |
| 7 | 7/16/2003 | fax to Richard Charland, Infinity Technology Services |
| 8 | 7/29/2003 | fax to Bert Falls and Al Calloway, Information Becomes Money |
| 9 | 6/25/2003 | fax to Ryan Jensen, Innotek |
| 10 | 8/28/2003 | fax to Michael Leavitt, Leavitt's Mortuary |
| 11 | 9/16/2003 | fax to Michael Leavitt, Leavitt's Mortuary |
| 12 | 2/07/2005 | fax to James Mack, Macino Enterprises |
| 13 | 2/18/2005 | fax to Phillip Elsworth, OTC Fiberglass |
| 14 | 7/14/2003 | fax to Mark McAfee of Organic Pastures |
| 15 | 10/25/2004 | fax to Kevin Fallen, Personal Touch Catering |
| 16 | 7/23/2003 | fax to Ted Howard, Senior Trends Network |
| 17 | 12/12/2003 | fax to Robert Hill, Triangle Transformation |
| 18 | 6/25/2003 | fax to Ken Hankin, Universal Healthcare |
| 19 | 6/02/2003 | fax to John Cain of 31S |

. . .

. . .

**Wire Cash Transfers**

| COUNT | DATE | FROM | AMOUNT |
|-------|------|------|--------|
| 20 | 1/28/2005 | Gary & Penny Cook to TIG Bank of America Acct. | $25,000 |
| 21 | 2/15/2005 | Excalibur Golf Club & Retirement to TIG Bank of America Acct. | $ 25,000 |
| 22 | 9/30/2003 | Information Becomes Money to TIG Wells Fargo Acct. | $50,000 |
| 23 | 3/28/2005 | Macino Enterprises to TIG Bank of America Acct. | $30,000 |
| 24 | 3/04/2005 | OTC Fiberglass to TIG Bank of America Acct. | $20,000 |
| 25 | 3/09/2005 | OTC Fiberglass to TIG Bank of America Acct. | $5,000 |
| 26 | 11/29/2004 | Personal Touch Catering to TIG Wells Fargo Acct | $35,000 |

All in violation of Title 18, United States Code, Section 1343.

**COUNT TWENTY-SEVEN**
False Statement

1.     The allegations set forth in the introduction and in counts one through twenty-six of this indictment are incorporated herein as if set forth in full.

2.     On or about April 26, 2005, in the State and Federal District of Nevada,

**CASEY LUCZAK,**

defendant herein, did knowingly and willfully make a false, fictitious, and fraudulent material statement in a matter within the jurisdiction of the Department of Justice-Federal Bureau of

9

1   defendant herein, did knowingly and willfully make a false, fictitious, and fraudulent material

2   statement in a matter within the jurisdiction of the Department of Justice-Federal Bureau of

3   Investigation, a department and agency of the United States; that is, Defendant did falsely

4   state that TIG used victims' processing fees to find funding for victims and pay project

5   directors, and to conduct due diligence examinations of victims' companies when he then and

6   there well knew that he had converted victims' processing fees to his own use and did not

7   use victims' processing fees to find funding for victims or pay project directors,

8         All in violation of Title 18, United States Code, Section 1001.

9   . . .

10   . . .

11   . . .

12   . . .

13   . . .

14   . . .

15   . . .

16   . . .

17   . . .

18   . . .

19   . . .

20   . . .

21   . . .

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

# FORFEITURE ALLEGATION

1.     The allegations of Counts One through Twenty-Six of this Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to the provision of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Codes, Section 2461(c).

2.     Upon a conviction of the felony offense charged in Counts One through Twenty-Six of this Indictment,

## CASEY LUCZAK,

defendant herein, shall forfeit to the United States of America, any property constituting, or derived from, proceeds traceable to violations of Title 18, United States Code, Section 1343, a "specified unlawful activity" as defined in 18 U.S.C. §1956(c)(7)(A) and 1961(1)(B) up to $2,200,000.00 in United States Currency.

3.     If any property being subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants –

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been place beyond the jurisdiction of the court;

      d.     has been substantially diminished in value, or;

      e.     has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any properties of the defendant up to $2,200,000.00 in United States Currency.

.   .   .

.   .   .

.   .   .

1      All pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United

2    States Code, Section 2461(c); Title 18, United States Code, Section 1343, a "specified

3    unlawful activity" as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and

4    1961(1)(B); and Title 21, United States Code, Section 853(p).

5    **DATED**, this the _28_ day of May 2008.

6    **A TRUE BILL:**

7

                      /s/

8                    FOREPERSON OF THE GRAND JURY

9

10   GREGORY A. BROWER
     United States Attorney

11

12

13   CHRISTINA M. BROWN
     Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26